**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DEBRA HALL** | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:CV-02-1255** |
| | : | **(JUDGE VANASKIE)** |
| **COMMONWEALTH OF PENNSYLVANIA** | : | |
| **DEPARTMENT OF CORRECTIONS** | : | |
| **Defendant** | : | |

**MEMORANDUM**

Before the Court is Defendant Commonwealth of Pennsylvania, Department of

Corrections' ("Department") Motion for Judgment as a Matter of Law or, alternatively, Motion for

a New Trial, as well as its Motion for a Remittitur.  Plaintiff Debra Hall alleged that the

Department engaged in unlawful employment discrimination in violation of federal and state

anti-discrimination laws.  Following a trial, the jury returned a verdict in favor of Ms. Hall on her

retaliation and hostile work environment claims and awarded her compensatory damages for

emotional distress of $1,000,000, a sum reduced to $300,000 in accordance with statutory

limitations.  Unwilling to accept this verdict, the Department filed the instant post-trial motions.

For the reasons that follow, the motion for judgment as a matter of law will be granted in part;

the motion for a new trial will be denied; and the motion to remit damages will be granted.

# I. BACKGROUND

Ms. Hall began working for the Department in 1990 at SCI-Graterford.  She was

transferred to the Department's training academy and then to SCI-Mahanoy and its security

section.  At all times material to this matter, Ms. Hall was stationed at SCI-Mahanoy.

(Transcript of Trial, Day One ("TR-1"), Dkt. Entry 97, at 27-28.)  She was promoted to Sergeant

in December 1993 or January 1994.  (Id. at 28.)

Ms. Hall alleged that almost from the beginning of her tenure with the Department she

was subjected to discriminatory treatment on account of her gender.  From comments that

women had no place at the Department to sexually explicit pictures and language to generally

abusive conduct, Ms. Hall claims she was the victim of a hostile work environment.

In 1998, she applied for, and was denied, a promotion to Lieutenant at SCI-Mahanoy.

Ms. Hall filed a complaint with the Pennsylvania Human Relations Commission ("PHRC")

alleging that the failure to promote was premised on gender, rather than a legitimate

employment-related concern.  Subsequent to the PHRC complaint, which eventually led to a

state court action in 2000, Ms. Hall claims the Department retaliated against her because of her

decision to file the discrimination complaints.  The retaliatory animus crescendoed through the

years and culminated in 2002, Ms. Hall alleged, when she was denied a promotional transfer to

SCI-Frackville.

Ms. Hall filed two complaints that were consolidated for trial.  On July 22, 2002, Ms. Hall

initiated an employment discrimination suit against the Department alleging sex discrimination

under Title VII of the Civil Rights Act of 1964.  Ms. Hall alleged she was denied a promotion to

Lieutenant in 1998 at SCI-Mahanoy in violation of 42 U.S.C. § 2000e-2(a)(1).[1]  The docket number of this case is 3:CV-02-1255.

On May 22, 2003, Ms. Hall initiated a second complaint against the Department alleging violations of Title VII and the Pennsylvania Human Relations Act ("PHRA").  In Count I, Ms. Hall alleged she was denied a promotion to Lieutenant at SCI-Frackville in 2002 because of sex in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1).  She also asserted a hostile work environment claim under § 2000e-2(a)(1).  Count II alleged that the refusal to promote in 2002 was also in retaliation for the sex discrimination lawsuits she previously filed against the Department, in violation of Title VII, 42 U.S.C. § 2000e-3(a).  Counts III and IV alleged similar gender discrimination (and hostile work environment) and retaliation claims under the PHRA, 43 Pa. Stat. Ann. § 955(a), (d).  The docket number of this case was 3:CV-03-0841.

On June 18, 2003, the two cases were consolidated under docket number 3:CV-02-1255.[2]  The cases were tried before a jury and, on July 23, 2004, the jury returned a verdict in favor of Ms. Hall and against the Department on Ms. Hall's retaliation and hostile work environment claims.  The jury awarded Ms. Hall $1,000,000 in damages for her emotional

---

[1]Throughout the Memorandum, citations to cases and statutes include hyperlinks to the Westlaw research database.  As such, the citation format on a printed copy of this Memorandum opinion will appear different from the Uniform System of Citation in that the entire hyperlinked citation will be underscored.

[2]The Court had jurisdiction over the Title VII claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3), and supplement jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

distress,[3] a sum reduced by the Court to $300,000 in accordance with the statutory cap on compensatory damages.[4]  (Order of Court, July 26, 2004, Dkt. Entry 85, at 3.)  See 42 U.S.C. § 1981a(b)(3)(D).

The Department has moved for judgment as a matter of law on both the retaliation and hostile work environment claims.  (See Dkt. Entry 93.)  Alternatively, the Department has moved for a new trial on the basis of several grounds, and also has sought a remittitur of the compensatory damage award.  (Id.)  The motions have been briefed, and oral argument has been presented.

## II. DISCUSSION

### A. Defendant's Motion for Judgment as a Matter of Law

A district court may grant a motion for judgment as a matter of law[5] if, and only if,

---

[3]Ms. Hall did not present any evidence of lost wages due to the failure to be promoted or any other evidence of economic harm.

[4]Judgment was entered with respect to the Title VII retaliation and hostile work environment claims only.  The Court dismissed Ms. Hall's state law claims – Counts III and IV in No. 3:CV-03-0841 – without prejudice.  (Order of Court, July 26, 2004, Dkt. Entry 85, at 2-3.)  The Eleventh Amendment deprives federal courts of jurisdiction to entertain suits brought by citizens against a state or state agency.  See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99 n.8 (1984).  The Commonwealth of Pennsylvania has not waived Eleventh Amendment immunity from suit in federal court under the PHRA.  See, e.g., Dennison v. Pensylvania Department of Corrections, 268 F. Supp. 2d 387, 404-05 (M.D. Pa. 2003).  As such, Ms. Hall's PHRA claims were dismissed.  (See Dkt. Entry 85, at 3.)

[5]Federal Rule of Civil Procedure 50(b) provides, in part:

If, for any reason, the court does not grant a motion for judgment as a matter

"viewing the evidence in the light most favorable to [the nonmoving party] and giving [it] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." Wittekamp v. Gulf & Western, Inc., 991 F.2d 1137, 1141 (3d Cir.), cert. denied, 510 U.S. 917 (1993). See also Fed. R. Civ. P. 50(b). The court may not weigh the evidence or otherwise adjudge the credibility of the witnesses. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000); McDaniels v. Flick, 59 F.3d 446, 453 (3d Cir. 1995). Moreover, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves, 530 U.S. at 151. "If the record contains even the 'minimum quantum of evidence upon which a jury might reasonably afford relief,' the verdict must be sustained." Shesko v. City of Coatesville, 324 F. Supp. 2d 643, 647 (E.D. Pa. 2004) (quoting Keith v. Truck Stops Corp. Of America, 909 F.2d 743, 745 (3d Cir. 1990)).

---

of law made at the close of all the evidence [pursuant to Fed. R. Civ. P. 50(a)], the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its motion no later than 10 days after the entry of judgment . . . .

Fed. R. Civ. P. 50(b). The Department moved for judgment as a matter of law on the retaliation and hostile work environment claims at the close of all the evidence, thereby satisfying its threshold obligation in order to renew its motion. (See Transcript of Trial, Day Three ("TR-3"), Dkt. Entry 99, at 213-14.)

### 1. The Retaliation Claim

The Department argues that it is entitled to judgment as a matter of law on Ms. Hall's retaliation claim.  Ms. Hall asserted that the denial of a promotional transfer to the position of Lieutenant at SCI-Frackville in 2002 was in retaliation for her previous complaints of sexual discrimination.  The jury returned a verdict in Ms. Hall's favor, and judgment was entered thereon.  The Department contends the evidence was insufficient to establish the causal connection between Ms. Hall's discrimination complaints and the subsequent denial of the promotion.

Under Title VII, employers are prohibited from discriminating against any of its employees because the employee has "opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Our Court of Appeals has enumerated three elements that a plaintiff must demonstrate for a prima facie case of retaliation:

> (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action.

Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).  The parties do not dispute that Ms. Hall engaged in "protected employee activity" – filing a PHRC complaint in 1998 and related state court civil lawsuit in 2000 – nor that the denial of the promotion was an adverse

employment action.  Therefore, the dispositive issue is whether there was sufficient evidence upon which to premise a reasonable conclusion that there was a "causal link" between the filing of the discrimination complaints and the subsequent denial of the promotion.

The Third Circuit has noted that the inquiry into whether a causal connection exists is fact-specific.  Farrell, 206 F.3d at 280.  In some circumstances, the temporal proximity between the protected activity and adverse employment action may suffice on its own to establish the causal connection.  See, e.g., Jalil v. Advel Corp., 873 F.2d 701 (3d Cir. 1989).  In Jalil, a Chilean employee filed a complaint with the New Jersey Division of Civil Rights and the Equal Employment Opportunity Commission alleging impermissible discrimination on account of national origin.  Id. at 703.  Jalil was fired two (2) days after his employer received a copy of the discrimination complaint.  Id.  The court concluded the employee established the causal connection because "the discharge followed rapidly, only two days later, upon [the employer's] receipt of notice of [the] EEOC claim."  Id. at 708.

In the absence of an "unduly suggestive" temporal proximity, the timing of the retaliatory action, on its own, cannot support the causal connection.  Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997).  In the absence of unduly suggestive timing, a plaintiff may point to a pattern of antagonism during the intervening time period.  See Robinson v. Southeastern Pennsylvania Transportation Authority, 982 F.2d 892 (3d Cir. 1993).  In Robinson, a black employee complained to management about a racially offensive comment

uttered by a co-worker.  Id. at 895.  Approximately five months later in February 1984, the

employee complained to the same manager of racial discrimination arising from a shift transfer.

Id.  The employee filed a union grievance and a PHRC complaint.  Id.  Subsequent thereto, the

employee's relationship with his direct supervisors degenerated rapidly as the employee was

subjected to repeated discipline for trivial matters and a concerted effort to provoke him to

rebellion.  Id.  The conduct abated briefly, but resumed in October and continued until the

employee's termination over one year later in December 1985.  Id.  The court concluded the

evidence was sufficient on the issue of causal connection to sustain the retaliation claim.  The

court acknowledged the absence of temporal proximity and that it would "be hard pressed to

uphold the trial judge's finding were it not for the intervening pattern of antagonism that SEPTA

demonstrated."  Id.  The Third Circuit ruled, however, that the trial court could reasonably

conclude that the employee's initial complaint spurred the retaliatory behavior, including the

harsh discipline, that culminated in his termination.  Id.

     Our Court of Appeals has emphasized that temporal proximity and an antagonistic

pattern of behavior are not the exclusive means to prove causal connection.  See Farrell, 206

F.3d at 280-81.  For instance, a plaintiff may demonstrate the connection with evidence that the

employer proffered inconsistent reasons to justify the adverse employment action.  See, e.g.,

E.E.O.C. v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir. 1997), cert. denied, 522 U.S. 1147

(1998); Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986).  Moreover, the

court has not hesitated to "explore the record in search of evidence," and has admonished the district courts to consider any "evidence gleaned from the record as a whole from which causation may be inferred." Farrell, 206 F.3d at 281; see also Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997) ("While each piece of evidence alone is not sufficient to support an inference of a pattern of antagonistic behavior, taken together the evidence is sufficient."); id. at 922 ("[E]ven if Zolman's statement was a mere stray remark, it can constitute evidence of the atmosphere in which the forced ranking was carried out, and would, therefore, be relevant to the question whether Scott retaliated against Woodson . . . ."). This searching inquiry, however, will not cure the absence of any evidence that the decision-makers were aware of the employee's protected activity and were motivated, at least in part, by a desire to retaliate. See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997) (no causal connection between protected activity and decision to restrict plaintiff's previously unrestricted computer access where no evidence presented to show that the only individual involved in the decision took the action in response to the E.E.O.C. complaint), abrogated on other grounds, Burlington Northern and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (U.S. 2006).

With these precepts in mind, the record will be examined to determine whether the jury could reasonably find a causal connection between Ms. Hall's protected activity and the Department's decision to deny her promotion to Lieutenant. Certainly, timing alone will not suffice to establish the causal link. Ms. Hall filed her PHRC complaint alleging sex

discrimination on June 24, 1998.  (See TR-1, at 76; Plaintiff's Exhibit 56.)  The amended

complaint in the state court action, which arose from the PHRC complaint, was filed on

February 11, 2000.  (See TR-3, at 198-99; Defendant's Exhibit 100.)  The denial of the

promotional transfer did not occur until the spring of 2002, approximately four years after the

PHRC complaint, and two years subsequent to the amended complaint.  (See Transcript of

Trial, Day Two ("TR-2"), at 12-14, 17-19.)  The timing of the decision not to promote Ms. Hall

fails to support an inference of retaliation.

Acknowledging this fact, Ms. Hall argues that the evidence demonstrates a clear pattern

of antagonism throughout the intervening period from which the jury could reasonably infer a

retaliatory motive behind the Department's decision not to promote Ms. Hall.  (See Plaintiff's

Brief in Opposition to the Defendant's Post-Trial Motions, Dkt. Entry 111, at 3.)  The

Department counters that any evidence of the intervening antagonism, which occurred at SCI-

Mahanoy, cannot be connected to the decisionmakers at SCI-Frackville who denied Ms. Hall

the promotion.  (See Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 7-

8.)

Ms. Hall's evidence of an abusive work environment concerns only events occurring at

SCI-Mahanoy, and has no connection to the promotion decision-makers – Miller and Kerestes .

For instance, in December 1998, Ms. Hall received an unflattering Christmas greeting making a

derogatory reference to the female anatomy.  (See TR-1, at 77-79.)  In April 1999, Ms. Hall's

co-workers awarded her a certificate in recognition of her ascension to "complete a–hole." (Id. at 79-81.)  Ms. Hall was subjected to a pat-down by a male corrections officer in the presence of higher ranking Department officials, which was clearly contrary to the Department's regulations.  (Id. at 88-90; TR-3, at 88-89.)  One of those officers, Captain Shipley, was amused by the incident.  (TR-1, at 89.)  Ms. Hall also expressed interest in the position of Property Sergeant, a highly coveted position.  Ms. Hall was previously assigned to that position on three separate occasions, none of which involved strip searches of male inmates.  (Id. at 85.)  The Department changed the position so that it could only be staffed by male corrections officers due to privacy concerns for male inmates who would be strip-searched.  (Id. at 86; TR-3, at 168-70.)  However, this change appeared to have transpired after Ms. Hall expressed interest in the position.  (TR-1, at 86, 96-98.)

The Department's disciplinary oversight of Ms. Hall was more scrupulous following the PHRC complaint and the amended state court complaint.  Ms. Hall was chastised by Lieutenant Richards simply because another employee, working overtime, filled up a Department vehicle with gasoline while Ms. Hall attended to other matters.  (Id. at 104-08.)  Another Lieutenant reported Ms. Hall for her refusal to complete a form relating to an incident which Ms. Hall did not personally observe.  (Id. at 117-18.)  Following an illness over Christmas in 2001, Ms. Hall obtained a physician's note to explain her absence from work.  (Id. at 121-23.)  The physician's note was insufficient because the note omitted required information.  (Id. at 124.)  Ms. Hall was

directed to submit a second note, and the Department convened a factfinder to investigate the incident. (TR-2, at 4-5.)  Similar incidents involving male officers submitting noncomplying physician's notes, however, did not result in the convening of factfinders.  (Id. at 5.)

From this evidence, the jury could conclude that the Department engaged in a pattern of antagonistic behavior following Ms. Hall's PHRC complaint and the later amended complaint in state court.  The treatment Ms. Hall experienced was similar to the conduct directed towards the employee in Robinson v. Southeastern Pennsylvania Transportation Authority, particularly the disciplinary measures inflicted upon the employee.  Ms. Hall, however, failed to show how her discrimination complaints, and the resulting antagonism, which occurred solely at *SCI-Mahanoy*, are connected to the decision by Major Joseph Miller and Deputy Superintendent John Kerestes, both of *SCI-Frackville*, to deny Ms. Hall the promotion to Lieutenant at *SCI-Frackville*.

Ms. Hall advances three arguments in an effort to link Major Miller and Deputy Superintendent Kerestes to the discrimination complaints and antagonistic behavior.  First, Ms. Hall asserts that Major Miller falsely disclaimed knowing of the discrimination complaints she had filed in Schuylkill County at the time he interviewed her in early 2002.  (See Plaintiff's Brief in Opposition to the Defendant's Post-Trial Motions,  Dkt. Entry 111, at 2.)  If a decision-maker was shown to have testified falsely that he did know that the plaintiff had engaged in protected conduct when the adverse employment action was taken, a jury could infer that the decision-

maker's deliberate falsehood was meant to shield the actual reason for the adverse action.

Indeed, Ms. Hall's retaliation claim was allowed to go to the jury precisely because this Court

believed that the evidence was sufficient to allow the jury to conclude that during his trial

testimony Major Miller falsely denied knowledge of the Schuylkill County case at the time he

interviewed Ms. Hall.  A close examination of the trial record, however, shows that this was

error.

On cross-examination, the following exchange occurred:

[Plaintiff's Attorney].  You were aware when you did the interviews, were you
not, that Sergeant Hall had filed a complaint *in this Court*
concerning discrimination?

[Major Miller].        No, no, I was not.

Q.              You weren't aware of that?

A.              No, sir.

Q.              Nobody told you?

A.              No, sir.

Q.              Were you aware that she had filed complaints *with the EEOC
and Pennsylvania Human Relations Commission*?

A.              No, sir, I wasn't.

(TR-3, at 59 (emphasis added).)  Contrary to Plaintiff's assertion, the context of the questioning

does not suggest that counsel was referring to the Schuylkill County case, in which Major Miller

was deposed.  The question plainly pertained to the action in this Court, which was not

commenced until July 22, 2002, after the interview process was concluded.  Furthermore, Plaintiff introduced no evidence to show that Major Miller knew or should have known of any discrimination complaints filed with an administrative agency.  Thus, the evidence does not support a conclusion that Major Miller testified falsely concerning knowledge of the Schuylkill County case at the time he considered Ms. Hall for a promotion.

Moreover, the Court's search of the entire record in this case has not revealed any link between Major Miller and the antagonistic behavior that occurred at SCI-Mahanoy.  The record is devoid of any evidence that Major Millier participated in, or supervised the malefactors responsible for, the Christmas greeting or certificate of "recognition"; that Major Miller was present or supervised the officers responsible for the pat-down of Ms. Hall; that Major Miller participated in the decision to make the position of Property Sergeant a male-only position; that Major Miller supervised any of the officers who disciplined Ms. Hall; or that Major Miller participated in, or otherwise knew of, the decision in 1998 not to promote Ms. Hall at SCI-Mahanoy.  Compare Robinson v. Southeastern Pennsylvania Transportation Authority, 982 F.2d at 895 (employee's immediate supervisors who unleashed a wave of retaliatory behavior reported directly to the superintendent of the garage, whose confrontation with the employee precipitated the union grievance).

Second, Ms. Hall asserts that Major Miller and Deputy Superintendent Kerestes gave inconsistent testimony as to whether they had agreed to provide identical ratings on the

interview evaluation forms.  (See Plaintiff's Brief in Opposition to the Defendant's Post-Trial

Motions,  Dkt. Entry 111, at 4-5.)  Again, however, the cross-examination to which Ms. Hall

refers is too indefinite to support an inference of a deliberate falsehood by either witness.  Major

Miller testified that his ratings and Kerestes' ratings were identical because Ms. Hall's poor

performance during the interviews was obvious.  (See TR-3, at 55.)  During the cross-

examination of Deputy Superintendent Kerestes, the following exchange took place:

> [Plaintiff's Attorney].  Let's take a look at the Defendant's Exhibits now.  You
> and Major Miller had both interviewed Sergeant Hall on
> at least two occasions during 2002, had you not?
>
> [Kerestes].  Yes, sir.
>
> Q.    And you got together afterwards and came to a conclusion
> about who you were going to promote?
>
> A.    Yes, sir.
>
> Q.    And how you were going to rate everybody, didn't you?
>
> A.    Yes, sir.
>
> Q.    As a matter of fact, you rated Ms. Hall – and I'm showing you
> Defendant's Exhibit 68 and 67 – identically?
>
> A.    Well, no not identically.  It looks like the Major missed one
> column at the bottom there.  I signed off on all the columns, so
> overall, yes.
>
> Q.    And in the interview in April of that year – and I'll show you
> what has been marked as Defendant's Exhibit 73 and 74 – you
> did the same thing, didn't you?
>
> A.    Yes, sir, it's the same rating, two months after the initial

interview.

(TR-3, at 68-69.)  This questioning does not support a rational inference that Miller and

Kerestes colluded to assure that each gave Ms. Hall identically poor ratings.  It merely shows

that each gave her the identical evaluation.  In context, the cross-examination simply shows

that the two conferred with respect to the promotion decision, which is consistent with Major

Miller's testimony that the two discussed each candidate.  (See TR-3, at 55.)  The evidence is

too indefinite to show an inconsistency sufficient to cast doubt on their testimony that retaliation

was not a motivating factor in the decision not to promote Ms. Hall.[6]

Finally, Ms. Hall argues that the record of disciplinary actions prepared for SCI-Mahanoy

Superintendent Robert Shannon establishes the necessary causal connection.  (See Plaintiff's

Brief in Opposition to the Defendant's Post-Trial Motions, Dkt. Entry 111, at 2-3.)  On March 27,

2002, Major Michaels of SCI-Mahanoy prepared a memorandum for Superintendent Shannon

summarizing disciplinary action received by Ms. Hall during her tenure at SCI-Mahanoy.  (See

Plaintiff's Exhibit 109.)  The memorandum, prepared on SCI-Mahanoy stationary, was delivered

to Superintendent Shannon prior to Ms. Hall's April 4 and May 23, 2002, interviews at SCI-

Frackville, and several months before Superintendent Shannon's transfer to SCI-Frackville,

where he became the Superintendent of that institution.  (TR-2, at 16-17, 19.)  Ms. Hall

---

[6]Furthermore, Ms. Hall presented no evidence that Deputy Superintendent Kerestes himself was aware of the discrimination complaints at the time of the SCI-Frackville promotion decisions.

contends that Superintendent Shannon met with Major Miller and Deputy Superintendent

Kerestes prior to their decision and, since the Department has not explained the purpose

behind the Michaels' memorandum to Shannon, the memorandum's only purpose was to justify

the decision not to promote Ms. Hall.

While Ms. Hall, as the verdict winner, is entitled to every advantageous inference and to

have the evidence viewed in her favor, an evidential abyss cannot be bridged by conjecture and

speculation.  Ms. Hall has not offered any evidence that this meeting actually occurred or that

Major Miller and Deputy Superintendent Kerestes were even aware of the Michaels'

memorandum.  Ms. Hall has failed to present sufficient evidence on this essential element of a

retaliation claim, and no reasonable jury could conclude otherwise.[7]

---

[7]Ms. Hall argues that her retaliation claim is similar to Zelinski v. Pennsylvania State Police, 108 Fed. Appx. 700, 707 (3d Cir. 2004), where our Court of Appeals reversed an order granting summary judgment in favor of the employer on the plaintiff's retaliation claim. However, Zelinski is distinguishable on two bases.  First, the plaintiff in Zelinski was subjected to "unfair criticism" following her complaints of sexual harassment from Corporal Altieri, to whom she reported the complaints in the first instance.  Id. at 702.  The alleged retaliatory transfer was ordered by supervisors within Corporal Altieri's chain of command.  Id.  Thus, there was an evidentiary basis to connect the intervening antagonism with the decision-makers who ordered the transfer.  Here, by contrast, there is insufficient evidence linking the intervening antagonism at SCI-Mahanoy and the decision by Major Miller and Deputy Superintendent Kerestes of SCI-Frackville to deny the promotion.

Second, in Zelinski, there were multiple, inconsistent reasons for the transfer.  Id. at 707. Here, Major Miller and Deputy Superintendent Kerestes have never wavered from their reasons why each decided against promoting Ms. Hall. (Compare Defendants's Exhibit 67 (Feb. 28, 2002, Interview Matrix of Deputy Superintendent Kerestes; explains that Ms. Hall is "unprofessional") and Defendant's Exhibit 73 (Apr. 4, 2002, Interview Matrix of Deputy

In summary, the evidence, viewed in the light most favorable to Ms. Hall, reveals the existence of a retaliatory animus at SCI-Mahanoy in the wake of Ms. Hall's discrimination complaints, but Ms. Hall has failed to connect this atmosphere to the denial of the promotion at SCI-Frackville.  As such, the record does not contain the "minimum quantum of evidence upon which a jury might reasonably afford relief."  Therefore, the Department's motion for judgment as matter of law with respect to Ms. Hall's retaliation claim will be granted.

### 2. The Hostile Work Environment Claim

The Department also argues that it is entitled to judgment as a matter of law on Ms. Hall's hostile work environment claim.  Ms. Hall alleged that her experience at SCI-Mahanoy was plagued by hostile treatment and discrimination on the basis of sex.  The jury returned a verdict in her favor on this claim.  The Department challenges two elements of the prima facie case: detrimental effect upon Ms. Hall and employer liability.  (See Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 37-38.)

Under Title VII, an unlawful employment practice includes "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment,

---

Superintendent Kerestes; explains Ms. Hall was "unprofessional"), with TR-3, at 64 (Deputy Superintendent Kerestes testified that Ms. Hall exhibited an "unprofessional demeanor"); compare Defendant's Exhibit 68 (Feb. 28, 2002, Interview Matrix of Major Miller; explains that Ms. Hall's "thoughts [were] unorganized") and Defendant's Exhibit 74 (Apr. 4, 2002, Interview Matrix of Deputy Major Miller; explains that Ms. Hall's "train of thought for situation ques. unorganized"), with TR-3, at 50 (Major Miller testified that "I had felt that her thoughts were disorganized").)

because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  The Supreme Court

stated in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986), that this language is not

"limited to 'economic' or 'tangible' discrimination."  Title VII is violated "[w]hen the workplace is

permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working

environment.'"  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor, 477

U.S. at 65, 67).  See also id. at 24 (Scalia, J., concurring).

        To establish a claim for a hostile work environment, the plaintiff must prove five

elements:

> (1) she suffered intentional discrimination because [of her sex]; (2) the
> discrimination was severe or pervasive;[8] (3) the discrimination detrimentally
> affected her; (4) it would have detrimentally affected a reasonable person in
> like circumstances; and (5) a basis for employer liability is present.

Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), implied overruling on other grounds

recognized by Moore v. City of Philadelphia, ___ F.3d ___, 2006 WL 2492256, at *8-9 (3d Cir.

Aug. 30, 2006); see also Morrison v. Carpenter Technology Corp., No. 05-1922, 2006 WL

---

        [8]The Third Circuit had required that discriminatory harassment be "pervasive and
regular."  See, e.g., Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir.2001); Abramson v.
William Paterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001).  In Pennsylvania
State Police v. Suders, the Supreme Court of the United States made it clear that the
harassment must be "sufficiently severe or persuasive to alter the conditions of [the
complainant's] employment."  542 U.S. 129, 133-34 (2004); see also Jensen v. Potter, 435 F.3d
444, 449 n.3 (3d Cir. 2006).

2413657, at *4 (3d Cir. Aug. 22, 2006).  "The record must be evaluated as a whole when [the Court] considers whether [Ms. Hall] proved her case."  Durham Life Insurance Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999).  The Department's motion for judgment as a matter of law challenges only elements three – the discrimination's detrimental effect upon Ms. Hall – and five – respondeat superior liability.  (See Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 37-38.)  The Court will address each issue in turn.

### a) Detrimental Effect Upon Ms. Hall

The Department argues Ms. Hall failed to produce evidence that she was detrimentally affected by the discriminatory acts, or that her conditions of employment were altered.  (Id. at 38.)  The Department contends that Ms. Hall's complaints were limited to feelings of embarrassment.  (Id. at 38-39.)  The record, however, does contain sufficient evidence from which the jury could reasonably conclude that Ms. Hall was detrimentally affected by the harassment.

A plaintiff need not have a nervous breakdown to recover for a hostile work environment claim.  Harris, 510 U.S. at 22.  "A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."  Id.  As long as the employee perceives the work environment as hostile, it is unnecessary for the environment to be "psychologically injurious."  Id.

Of course, that a psychological injury is unnecessary does not dispense with the requirement that plaintiff must show she has been detrimentally affected in *some* manner. "'The subjective factor is crucial because it demonstrates that the alleged conduct injured this particular plaintiff giving her a claim for judicial relief.'" Spain v. Gallegos, 26 F.3d 439, 447 n.10 (3d Cir. 1994) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1483 (3d Cir. 1990)).

In Spain, the plaintiff alleged she was the victim of sexual harassment because she was the target of false rumors that she was having a sexual affair with a supervisor, gaining influence as a result. Id. at 447. The rumors arose over time because the plaintiff and her superior were often observed together in private meetings. Id. The meetings were in fact convened by the supervisor to solicit improper loans from the plaintiff. Id. at 442. After plaintiff became aware of the rumors, she complained to the supervisor and urged him to stop the rumors. Id. However, the meetings continued and the rumors did not dissipate, which strained the plaintiff's working relationship with her co-workers and other supervisors. Id. Plaintiff became miserable and unable to effectively confront the situation. Id. After the plaintiff ceased the loans, the superior escalated his harassment and eventually denied the plaintiff a promotion. Id.

On appeal, the court held the plaintiff established a prima facie case on her hostile work environment claim, including a jury question on the issue of whether she was detrimentally

affected.  Id. at 449.  The plaintiff perceived the situation as hostile, and she introduced

evidence of the effect the environment had on her.  The plaintiff's reputation was impugned by

the rumors; she was generally embarrassed and miserable; her relationship with her co-

workers and supervisors deteriorated, resulting in negative performance evaluations; and she

was denied a promotion because of the rumors.  Id. at 447-48.  Therefore, the plaintiff

adequately demonstrated "an abusive environment as manifested through her co-workers' and

supervisors' interaction with her."  Id. at 449.  See also Abramson v. William Paterson College

of New Jersey, 260 F.3d at 270-71 & 280 (3d Cir. 2001) (jury could reasonably conclude that

the plaintiff was detrimentally affected by the hostile work environment of religious

discrimination where she devoted considerable energy defending her reputation, experienced

"'continu[ous] and unwarranted negativism,'" and one of her colleagues declared she was a

"'beaten puppy'"); Hightower v. Roman, Inc., 190 F. Supp. 2d 740, (D.N.J. 2002) (in the wake of

numerous racial epithets and jokes, employee felt "'humiliated, disrespected, and angry'").

In Hall v. Bell Atlantic Corp., 152 F. Supp. 2d 543, 544 (D. Del. 2001), the plaintiff

claimed he was subjected to a hostile work environment on the basis of racial discrimination.

On the issue of subjective detrimental effect, he argued that he was denied, while white

employees were given, opportunities to work in the field (as opposed to behind a desk in a

office) to earn overtime as well as additional job-related training.  Id. at 550.  Furthermore, he

asserted that his employer threatened him with termination and loss of benefits.  Id.  The court

determined there was insufficient evidence to show that the employee was detrimentally

affected by the defendant's conduct because the plaintiff was still employed at a high salary

level disproportionate to his actual duties, and he continued to receive benefits and training.  Id.

at 551.  See also Bishop v. National Railroad Passenger Corp., 66 F. Supp. 2d 650, 665 (E.D.

Pa. 1999) (although plaintiff was fearful that she could be fired, which caused sleepless nights,

plaintiff never alleged that "the behavior interfered with her work performance, nor that she felt

physically threatened or humiliated").

As this discussion illustrates, the question of whether a plaintiff has been detrimentally

affected by a hostile work environment is fact-intensive.  In this case, the evidence presented

by Ms. Hall as to the subjective effect the hostile work environment had on her is sufficient to

sustain the jury's verdict.  The jury was entitled to conclude (if it chose) that Ms. Hall was

embarrassed and humiliated by the harassment she endured.  Ms. Hall's troubles went back as

far as November 1994, when Ms. Hall participated in a hostage training exercise.  Ms. Hall

volunteered to play the role of a hostage; however, she never expected to be left outside in the

rain for three hours.  (TR-2, at 9-10; TR-2, at 120.)  Ms. Hall recounted the time she arrived at

work and discovered the shameful Christmas greeting that referred to the female anatomy.

(TR-1, at 77-79.)  There was the incident when Ms. Hall received the certificate of recognition

from her co-workers for her ascension to "complete a–hole."  (Id. at 79-81.)  Ms. Hall had

opened an envelope containing the certificate, addressed to her, and in the presence of other

officers; she was "very embarrassed and upset."  (Id. at 81.)  She was subjected to a pat-down

by a male corrections officer while two supervisors stood nearby and observed the incident.

(Id. at 88-90.)  Afterwards, one of the supervisors expressed amusement.  (Id. at 91.)

Furthermore, male corrections officers would utter vulgarity and other derogatory remarks in

her presence.  (See, e.g., id. at 90.)  From this testimony, viewed in Ms. Hall's favor, the jury

could find Ms. Hall was detrimentally affected by the hostile work environment of SCI-Mahanoy.

The Department argues that embarrassment does not equate to having one's

employment altered.  (See Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry

108, at 39; Transcript of Oral Argument, Sept. 15, 2005, Dkt. Entry 129, at 36.)  However,

Abramson, Spain, and Hightower state that feelings of embarrassment and humiliation may

constitute the detrimental effect necessary to prevail on a hostile work environment claim.  The

jury could infer that the embarrassment and humiliation felt by Ms. Hall altered her approach to

her job, how she perceived her role at SCI-Mahanoy, and her relationships with her co-workers.

Moreover, Ms. Hall presented evidence that the sexual harassment she endured at SCI-

Mahanoy did alter the conditions of her employment.  Ms. Hall was forced to proceed with

caution as she was subjected to harsh discipline at times, and her work performance was

carefully scrutinized by her superiors and others.  In 2001, a factfinder was convened to

investigate the incident with Officer Mushalko in which Ms. Hall was accused of "disrupting the

orderly running of [the breakfast] mainline," taunting several inmates, and endangering the

safety of fellow corrections officers and inmates alike.  (TR-1, at 113-14.)  It was later

determined that Ms. Hall followed Department policy.  (Id. at 115.)  Ms. Hall was criticized by

Lieutenant Lencovich because she was unwilling to complete a form about an incident she did

not personally observe.  (Id. at 116-18.)  Lieutenant Baddick was confrontational with Ms. Hall

on several occasions, including the time Ms. Hall held inmates at the gate leading to the prison

yard, (id. at 119-21); the time Ms. Hall modified the schedule when inmates would clean the

showers in the C-Block, (TR-2, at 20-25); and the time when Ms. Hall was told she was not

permitted to work in the control room, (id. at 29-30).  Thus, Ms. Hall's working conditions were

altered because she devoted time defending herself and incurred, at times, "unwarranted

negativism."  See Abramson, 260 F.3d at 270, 280.

    In summary, Ms. Hall presented the "minimum quantum of evidence" necessary for the

jury to conclude that she was detrimentally affected by the hostile work environment.  At times

Ms. Hall was embarrassed and humiliated; other times, her experience was similar to the

plaintiff in Spain, and she adequately demonstrated "an abusive environment as manifested

through her co-workers' and supervisors' interaction with her."  Spain, 26 F3d at 449.

Therefore, the Department is not entitled to judgment as a matter of law on this basis.

### b) Employer Liability

    Additionally, the Department objects to the jury's verdict on the ground that Ms. Hall

failed to establish a basis for employer liability.  The Department argues that it responded to

Ms. Hall's complaints, no matter how trivial, with swift action.  (See Defendant's Brief in Support

of its Post-Trial Motions, Dkt. Entry 108, at 39, 42.)

In general, an employer is not strictly liable for a hostile work environment.  Kunin v.

Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1998).  Instead, liability may be imposed

where the employer "'knew or should have known of the harassment and failed to take

adequate remedial action.'"  Id. (quoting Andrews, 895 F.2d at 1486).  Where the employer has

actual notice of the harassment and the remedial measures it implements are effective, i.e.,

stops the harassment, there can be no Title VII liability.  Id. at 294;  Bouton v. BMW of North

America, Inc., 29 F.3d 103, 110 (3d Cir. 1994).  See also Knabe v. Boury Corp., 114 F.3d 407,

414 (3d Cir. 1997) (employer cannot be liable where the "remedy is reasonably calculated to

prevent future instances of harassment").  In Kunin, the employee notified her supervisor of a

co-worker's derogatory statements.  Kunin, 175 F.3d at 294.  Because the supervisor promptly

instructed the co-worker to avoid any contact with the complainant, who experienced no further

harassment, this notice could not establish employer liability.  Id.

It is important to emphasize that the employer must take *some* remedial measure

subsequent to its receipt of notice of the allegedly unlawful conduct.  In Kunin, the employer's

supervisor promptly met with the co-worker and instructed him to stay away from the

complainant.  Id.  In Knabe, a waitress complained that her manager committed various acts of

sexual harassment.  Knabe, 114 F.3d at 408-09.  An investigation was conducted in which the

manager denied the allegations, and other employees reported they had not observed any of the alleged misconduct.  Id. at 409.  The investigation concluded the allegations were unfounded, based upon the mistaken assumption that corroborating evidence was necessary. Id.  Nevertheless, the manager was reminded that the restaurant does not tolerate sexual misconduct, and any violations may result in suspension or discharge.  Id.  The court held that, while the investigation was imperfect and the manager was not disciplined, the warning he received was "reasonably calculated to prevent further harassment."  Id. at 413.

Employer liability may arise, however, where the employer merely investigates the complaint without taking any remedial action, or the investigation is so flawed that any remedial measures are destined to fail.  Id. at 414.  See also Fuller v. City of Oakland, 47 F.3d 1522 (9th Cir. 1995).  In Fuller, a police department's internal affairs division investigated a report of sexual harassment by a recently promoted male officer against a female officer.  Fuller, 47 F.3d at 1526.  Among the misconduct included angry, threatening telephone calls on a regular basis. Id. at 1525.  The investigation resulted in a finding of "unfounded," which meant the evidence proved the allegations did not occur.  Id. at 1526.  The findings were predicated, in part, on the absence of any harassing telephone calls subsequent to the commencement of the investigation.  Id.  After the investigation, the police department did not take any remedial action against the officer, although, by happenstance or otherwise, the officer apparently stopped his harassing conduct.  Id.  The court held the employer nonetheless could be liable, rejecting the

27

argument that simply because the harassment ceased, the employer's response was

reasonable.  Id. at 1528.  Since the court found the existence of a hostile work environment,

which was known or should have been known by the police department, "a remedial obligation

kick[ed] in."  Id.  The court was troubled by the inadequate investigation, and was equally

distressed by the failure of the department to take any remedial measures:

> An employer whose sole action is to conclude that no harassment occurred
> cannot in any meaningful sense be said to have "remedied" what happened.
> Denial does not constitute a remedy.  Nor does the fact of investigation alone
> suffice; an investigation is principally a way to determine whether any remedy
> is needed and cannot substitute for the remedy itself.

Id. at 1529.

Even when the employer does not have actual notice of the harassment, the employer

may be on constructive notice of such conduct and, consequently, be liable.  In Kunin, the court

set forth two instances of constructive notice.  First, the "employee provides management level

personnel with enough information to raise a probability of sexual harassment in the mind of a

reasonable employer."  Kunin, 175 F.3d at 294.  Second, the "harassment is so pervasive and

open that a reasonable employer would have been aware of it."  Id.

The court in Kunin found insufficient evidence of constructive notice because the alleged

harassment occurred over a short period of time – approximately three weeks – and there was

limited interaction between the two employees since they did not work together on a daily basis.

Id. at 295.  Furthermore, the harassment was not easily ascertainable by management because

the offensive conduct was directed at the plaintiff personally and outside the presence of

management.  Id.  Therefore, the employer was not liable.

In the matter *sub judice*, the Department initially took some remedial action following Ms.

Hall's complaints of harassment. The Department required Officers Lowe and Hocking to

undergo a counseling session following the 1997 incident in which the duo impeded Ms. Hall's

access to the control room and smashed oranges using an automated door.  (TR-1, at 52.)

After the unflattering Christmas greeting in 1998, the Department posted a memorandum to all

employees advising them that items of an offensive nature will not be tolerated and violations

will be punished.  (Id. at 78-79; see also Plaintiff's Exhibit 62.)  Following the pat-down of Ms.

Hall by a male corrections officer, Lieutenant Baddick, who was present at the time, was

required to account for the incident by Major Erickson.  (TR-3, at 89.)  And, after Sergeant

Ireland's inappropriate use of vulgarity during roll call, he apologized to Ms. Hall.  (TR-1, at 95.)

In this regard, the Department's remedial measures were similar to the employer's response in

Kunin and Knabe in that the measures were either effective or at least "reasonably calculated to

prevent further harassment."

Nevertheless, this case is distinguishable from Kunin and Knabe.  Ms. Hall does not

allege that she was victimized by just one or two perpetrators.  Instead, the hostile work

environment here was systemic and involved co-workers and supervisors alike.  In this respect,

the Department's remedial measures were neither effective nor "reasonably calculated to

prevent further harassment."  The Department's actions in 1997, 1998, or 1999 did nothing to halt or remedy the ongoing gender-motivated conduct directed at Ms. Hall.  And, while Ms. Hall did not notify the Department of all cases of harassment, particularly in the latter part of the relevant time period, there was sufficient evidence for the jury to conclude that the Department should have known of the harassment yet failed to take prompt and adequate remedial measures.

As noted in Kunin, an employer is deemed to have constructive notice when the "harassment is so pervasive and open that a reasonable employer would have been aware of it."  Kunin, 175 F.3d at 294.  Here, unlike Kunin, the harassment was suffered over an extended period of time.[9]  Several of these incidents involved Lieutenant Baddick, Lieutenant Wetzel, and Lieutenant Lencovich.  Since the perpetrators of the harassment were often Ms. Hall's supervisors, the jury could conclude that the Department should have known of the misconduct but failed to take adequate remedial measures.

In addition to constructive notice, the Department had actual notice of Lieutenant Baddick's more recent harassment.  In 2002, Ms. Hall accused Lieutenant Baddick of

---

[9]The harassment need not be sexual in nature, but has to be motivated by sex.  See Durham Life Insurance Co. v. Evans, 166 F.3d 139, 148 (3d Cir. 1999) ("[F]acially neutral mistreatment plus the overt sex discrimination, both sexual and non-sexual, in sum constitute[s] the hostile work environment.").  Therefore, the Department's contention that it could not have known of the misconduct after 1999 because the misconduct was not enmeshed in sexual overtones, (see Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 43), is without merit.

harassment after the C-Block shower incident.  Ms. Hall changed the time for the inmates to

clean the showers after conferring with Lieutenant Baddick.  (TR-2, at 22-23.)  However,

Lieutenant Baddick harshly reprimanded Ms. Hall for her actions, although he previously

acquiesced in her decision.  (Id. at 23-24.)  Ms.Hall complained to the personnel director about

Lieutenant Baddick.  (Id. at 19.)  The Department concluded that Ms. Hall was not harassed or

otherwise subjected to a hostile work environment.  (Id. at 25.)  Ms. Hall continued to have

problems with Lieutenant Baddick, most notably the incident where Lieutenant Baddick told Ms.

Hall she was not permitted in the control room.  (Id. at 29-30; TR-3, at 93, 107.)  The jury could

conclude that the Department's investigation was inadequate and had emboldened Baddick to

persist in his discriminatory treatment.  The Department's inaction cannot shield it from liability.

See Fuller, 47 F.3d at 1528-29.

An employer is liable under Title VII when the employer knew, or should have known, of

the harassment and failed to take prompt and adequate remedial measures.  In this case, the

record contains the "minimum quantum of evidence upon which a jury might" reasonably

conclude that the Department should have known of the harassment and failed to take any

remedial action.  Accordingly, the Department's motion for judgment as a matter of law will be

denied.

## B. Defendant's Motion for a New Trial

In the alternative, the Department moves for a new trial under Federal Rule of Civil

Procedure 59(a),[10] premised on several grounds.  "The decision to grant or deny a new trial is within the sound discretion of the trial court . . . ."  Cordis Corp. v. Boston Scientific Corp., 431 F. Supp. 2d 442, 447 (D. Del. 2006).  See also Olefins Trading, Inc. v. Han Yang Chem Corp., 9 F.3d 282, 289-90 (3d Cir. 1993).  The Court may grant a new trial where the "jury's verdict is against the clear weight of the evidence," or where there has been "improper conduct by an attorney or the court [that] unfairly influenced the verdict."  Cordis Corp., 431 F. Supp. 2d at 448.  A motion for a new trial may also be granted where the admission or rejection of evidence resulted in substantial error.  Tristrata Technology, Inc. v. Mary Kay, Inc., 423 F. Supp. 2d 456, 468 (D. Del. 2006) (citing Goodman v. Pennsylvania Turnpike Commission, 293 F.3d 655, 676 (3d Cir. 2002)).

The Department asserts four grounds in its motion for a new trial.  First, the Court erred by admitting the 1994 Erickson and Phillips memoranda.  (Defendant's Post-Trial Motion, Dkt. Entry 93, at ¶ 11(a).)  Second, the Department argues the submission of the retaliation claim to the jury "irreversibly infected" the hostile work environment claim.  (Id. at ¶ 11(b); Defendant's

---

[10]Rule 59(a) provides, in part:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . .

Fed. R. Civ. P. 59(a)(1).

Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 23.)  Third, the Department contends the Court allowed testimony concerning highly prejudicial material that was not disclosed to the Department during discovery.  (Defendant's Post-Trial Motion, Dkt. Entry 93, at ¶ 11(d).)  Finally, the Department asserts that the jury verdict was the product of passion and prejudice.  (Id. at ¶ 11(c).)

### 1. Erickson and Phillips Memoranda

The Department argues it was error to allow the admission of two memoranda, prepared in 1994, written by Major Erickson and Deputy Superintendent Phillips, respectively.  In the first memorandum, Major Erickson wrote to Deputy Superintendent Phillips that Ms. Hall should not be granted a permanent promotion to Sergeant.  (See Plaintiff's Exhibit 31.)  The second, addressed to SCI-Mahanoy Superintendent Dragovich from Deputy Superintendent Phillips, concurred in Major Erickson's assessment and stated that, due to Ms. Hall's attitude, the most efficacious manner to change one's attitude is to "humbl[e]" him or her so he or she suffers a "significant emotional event."  (Plaintiff's Exhibit 32.)  The Department moved in limine to exclude the memoranda, which the Court denied.  (See Order of Court, June 29, 2004, Dkt. Entry 53.)  In its motion for a new trial, the Department asserts the memoranda was not relevant background information and, in any event, the Department was prejudiced by their admission.  (See Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 17-22.)

The Federal Rules of Evidence provide that "[a]ll relevant evidence is [generally] admissible." Fed. R. Evid. 402.  Evidence is relevant when it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Fed. R. Evid. 401.

In Glass v. Philadelphia Electric Co., 34 F.3d 188, 195 (3d Cir. 1994), our Court of Appeals reversed the district court's decision that prevented the plaintiff from introducing evidence of prior discriminatory acts against the defendant that occurred outside of the statutory limitations period.  In reversing, the court noted the "judicial inhospitability to blanket evidentiary exclusions in discrimination cases." Id.  The court quoted with approval the Eighth Circuit's explanation of this "judicial inhospitability":

> The effects of blanket evidentiary exclusions can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of his own motives.
>
> * * * *
>
> Circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices–evidence which in other cases may well unfairly prejudice the jury against the defendant.  In discrimination cases, however, such background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.

Id. (quoting Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1998), overruled in part on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)).  The Glass court

34

concluded the proffered evidence was relevant to enable the plaintiff to establish that the employer's legitimate nondiscriminatory reason was pretextual.  Id. at 194-95.  See also National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, (2002) (prior acts of discrimination, which are not actionable because a claim is time-barred, can be introduced as "background evidence in support of a timely claim").

In the case at bar, the Erickson and Phillips memoranda were highly relevant background evidence that placed the conduct of the Department in an appropriate context.  The memoranda are probative of the Department's attitude towards Ms. Hall and whether it acted with a discriminatory intent.  The memoranda, when viewed in light of Superintendent Shannon's previous remarks to Ms. Hall when she was first employed that the Department is no place for women, reveals an atmosphere in the Department condoning invidious discrimination against Ms. Hall.

The Department counters unpersuasively that the memoranda cannot be relevant because Ms. Hall was not denied the promotion to the position of Sergeant as a result of the memoranda.  It is true that Ms. Hall was not demoted from Sergeant, and Deputy Superintendent Phillips did not take any adverse action against Ms. Hall.  However, Ms. Hall was subjected to discriminatory conduct after that point, and the memoranda help explain why the conduct was permitted to continue unabated by the Department's supervisors.  The Department's attitude and its desire to humble Ms. Hall is probative in explaining why Ms. Hall

was left outside in the rain for three hours during a hostage training exercise, or why Ms. Hall was subjected to a pat-down by a male corrections officer in the presence of two supervisors, or why Lieutenant Baddick was constantly confrontational with Ms. Hall.  As such, the memoranda were relevant and properly admitted.

The Department also argues that the memoranda were not relevant because Ms. Hall was not aware of their existence until 2000.   In support, the Department cites Konstantopoulos v. Westvaco Corp., 112 F.3d 710 (3d Cir. 1997).  In Konstantopoulos, the plaintiff asserted a hostile work environment claim arising from discriminatory conduct between April 1989 to August 1989.  Id. at 712.  Following a leave of absence for several months, the plaintiff returned in April 1990, and she alleged further harassment.  Id. at 713.  Noting a "plaintiff must subjectively perceive the environment to be hostile or abusive," id. at 715, the court concluded that harassment occurred from April 1989 to August 1989, but that the plaintiff was not subjected to a hostile work environment when she returned in April 1990, id. at 716.  The court reasoned that the "passage of nearly seven months [was] significant" because the "hiatus provided an opportunity for the lingering effects of the prior incidents to dissipate."  Id.  The court never addressed, nor was presented with, the issue of admissibility of prior acts as background evidence to support a hostile work environment claim.  The court simply held that the intervening passage of time was too great to enable the April 1990 conduct to be connected to the discriminatory acts in 1989, which the court concluded was a hostile work environment.

Therefore, the Department's reliance on Konstantopoulos is misplaced.

In summary, the Erickson and Phillips memoranda were properly admitted as relevant background evidence.  The Department's motion for a new trial on this ground will be denied.[11]

### 2. Impact of the Improper Retaliation Verdict

The Department argue that submission of the retaliation claim to the jury "irreversibly infected" the hostile work environment verdict.  (See Defendant's Post-Trial Motion, Dkt. Entry 93, at ¶ 11(b); Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 23.)  As support, the Department cites Rush v. Scott Specialty Glass, Inc., 113 F.3d 476 (3d Cir. 1997).

In Rush, the plaintiff asserted that her employer discriminated against her regarding promotion and training decisions on the basis of sex, subjected her to a hostile work environment, and constructively discharged her.  113 F.3d at 477-78.  Prior to trial, the employer moved for summary judgment, arguing that the plaintiff's claims that accrued more than 300 days before she filed her second EEOC complaint, such as the promotion decision, were time-barred.  Id. at 479-80.  The district court denied the employer's motion, and the case

---

[11]The Department argues it was prejudiced by Ms. Hall's attorney's repeated references to the memoranda.  The Department argues that Ms. Hall's attorney, Mr. Loftus, in fact made the memoranda the "centerpiece" of her case.  Mr. Loftus questioned several witnesses about the memoranda, and referred to the same in his opening statement and closing argument, as a backdrop to explain the Department's attitude in regards to subsequent events for which Ms. Hall sought damages.  Ms. Hall could not recover on the basis of the memoranda, but she could emphasize the memoranda to explain the intent behind the Department's subsequent actions and inaction.

proceeded to trial where the jury returned a verdict in her favor on most of her claims, including the failure to promote and train claim. Id. at 480. The jury awarded the plaintiff one aggregate damage award on all the claims, rather than an apportionment of damages to each claim. Id. On appeal, the court held the district court's denial of the employer's motion for summary judgment on the failure to promote and train claim was erroneous because the claim was time-barred. Id. at 484-85. Because the jury was not required to allocate specific portions of the damages to each claim, it was impossible to determine which portion of the damage award was attributable to the time-barred failure to promote and train claim. Id. at 485. Hence, the damage award was reversed. Moreover, because the evidence presented on the failure to promote and train claim may have prejudiced the hostile work environment and constructive discharge claims, the court reversed the verdicts on those claims. Id.

The Department's reliance on Rush is misplaced. In Rush, the district court's denial of the employer's motion for summary judgment was erroneous because the failure to promote and train claim was time-barred. But for the district court's decision, evidence of this claim would never have been presented to the jury, thereby eliminating the prejudicial effect on the liability verdict and damage award. Here, by contrast, the Department never filed a motion for summary judgment in this case. Thus, Ms. Hall would have presented evidence to the jury on her retaliation claim because the Department took no action to prevent its introduction in the first place.

38

Additionally, the Department's argument that the retaliation claim's prejudicial effect is most acute on the issue of damages is hard to fathom given the Department's failure to object to the special verdict questions submitted to the jury.  The special verdict questions addressed the failure to promote, hostile work environment, and retaliation claims in separate interrogatories; if the jury found the Department liable on any of the claims, the jury was to proceed to special interrogatory number four, which called for one damage award for all claims in which liability was found.  (See Jury Verdict, Dkt. Entry 77.)  On the morning of closing arguments, the Court met with counsel and discussed the special verdict form.  After allowing counsel the opportunity to review the form, the Court asked both attorneys whether either objected to the form.  Mr. Doyle, the Department's attorney, responded "They're fine."  (TR-4, at 10 (emphasis added).  See also Transcript of Oral Argument, Sept. 15, 2005, Dkt. Entry 129, at 35 (Mr. Doyle acknowledges he did not request a special verdict form for the retaliation claim).)  Therefore, the Department's motion for a new trial on this ground is without merit.

### 3. Testimony Not Disclosed to the Department

The Department argues a new trial should be granted because it was prejudiced by Ms. Hall's testimony relating to her interaction with Lieutenant Wetzel.  The Department contends that, when asked through interrogatories or at her deposition to identify any individual who allegedly sexually harassed her, Ms. Hall did not disclose Lieutenant Wetzel's name.  (See Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 24).  Furthermore, Ms.

Hall did not identify Lieutenant Wetzel as an individual likely to have discoverable information as part of her Federal Rule of Civil Procedure 26 disclosures.[12]  (Id. at 24-25.)

At trial, however, there were several references to the alleged misconduct by Lieutenant Wetzel.  First, Ms. Hall was testifying to the incident with Officer Mushalko and Lieutenant Wetzel's involvement in the subsequent pre-disciplinary conference.  Though not in response to a question from her attorney, Ms. Hall gratuitously offered that Lieutenant Wetzel had continuously asked her out.  (See TR-1, at 112.)  The Department objected solely on the basis that the "testimony ha[d] nothing to do with the incident," the incident being the one involving Officer Mushalko.  (Id.)  The Court overruled the objection, and Ms. Hall testified that Lieutenant Wetzel was married and that she rebuffed his advances.  (Id.)  Second, Ms. Hall was asked about any altercations she had with Lieutenant Wetzel, to which she replied of an incident in the prison dining hall.  (TR-2, at 117.)  Ms. Hall testified that one day Lieutenant Wetzel entered the dining room, was "clowning around," and once again asked Ms. Hall out.  (Id.)  Ms. Hall told

---

[12]Specifically, Rule 26(a)(1)(A) provides, in part:

(1) . . . [A] party must, without awaiting a discovery request, provide to other parties:
> (A) the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.

Fed. R. Civ. P. 26(a)(1)(A).

him, "I wasn't interested, and he reached over, and I consequently ended up with a bloody knows [sic]."  (Id.)   The Department raised no objections during this testimony.  Next, James Petch, formerly employed at SCI-Mahanoy, testified about the dining room incident with Lieutenant Wetzel.  (Id. at 124.)  He was then asked whether he know about Lieutenant Wetzel's overtures to Ms. Hall.  (Id.)  The Department objected solely on the basis that the question was leading; the Court overruled the objection.  (Id.)  Finally, Ms. Hall's attorney referred to Lieutenant Wetzel briefly in his closing argument.  (See Transcript of Trial, Day Four ("TR-4"), Dkt. Entry 100, at 19.)  The Department did not object.  In her brief in opposition to the Department's post-trial motions, Ms. Hall argues that "[n]othing precluded the [Department] from objecting at trial and requesting that the testimony be excluded if [the Department] felt that the information was improperly withheld."  (Plaintiff's Brief in Opposition to the Defendant's Post-Trial Motions, Dkt. Entry 111, at 8.)

       "[A] party may not seek a new trial on the basis of objections not raised in the original trial."  Boston Scientific Scimed, Inc. v. Cordis Corp., 434 F. Supp. 2d 308, 318 (D. Del. 2006). See also Waldork v. Shuta, 142 F.3d 601, 629 (3d Cir. 1998); Finch v. Hercules Inc., 941 F. Supp. 1395, 1416 (D. Del. 1996).  In Finch, the plaintiff objected to statistical evidence presented by the defendant's expert witness because the testimony was not previously disclosed during discovery.  Finch, 941 F. Supp. at 1416.  At trial, the plaintiff did not object to the "allegedly new and previously undisclosed material," and instead cross-examined the expert

41

witness on the unanticipated statistical evidence.  Id.  The plaintiff's first objection was in the

form of a motion for a new trial.  Id.  The court declined to reach the merits of the plaintiff's

argument since his "failure to object must be deemed a waiver of his right to assert the new

argument post-trial."  Id.

The Department did not object to the testimony about Lieutenant Wetzel on the ground

that Ms. Hall had failed to disclose her allegations of sexual harassment against him during

discovery.  The Department objected twice, but on unrelated grounds of relevance and that a

question was leading.  The Department conceded at oral argument that it did not object at trial

on the basis that the testimony was a complete surprise, nor did the Department request a

sidebar conference.  (See Transcript of Oral Argument, Sept. 15, 2005, Dkt. Entry 129, at 22.)

Moreover, that the Department was capable of objecting on this ground is manifested by the

following exchange, where the Department objected to Ms. Hall's attempt to testify about a late-

night telephone call:

> [Ms. Hall].     During one such night, I was at home sleeping, and my phone
>                 rang, and I had answered the phone, and I heard, in a
>                 whispering voice, What do you have on?
>
> [Department's attorney] Mr. Doyle:  Your Honor, I'm going to object.
>
> The Court:     I'm going to sustain the objection.  I'll see counsel.
>
>                        (Sidebar discussion on the record.)
>
> The Court:     How does she tie this up–

42

[Ms. Hall's attorney] Mr. Loftus:     It was one of the Commissioned Officers.

Mr. Doyle:     Your Honor, I asked her six ways to Sunday about every instance of harassment, during her deposition, and this never came out.  And it's not the kind of thing I can impeach.  I can't flop the deposition on the table and say, Tell me where you mentioned this.

The Court:     Was this previously disclosed, this incident?

Mr. Loftus:     Not that I recall.

The Court:     Well, I won't allow it then.

(Sidebar discussion concluded.)

(TR-2, at 54-55.)

No similar exchange occurred when Ms. Hall testified about Lieutenant Wetzel constantly asking her out, or when she and James Petch testified to the dining room incident where Lieutenant Wetzel allegedly made contact with Ms. Hall, causing her nose to bleed. Neither Mr. Loftus nor the Court would have been on notice of this challenge when the Department merely objected that the testimony was unrelated to the Officer Mushalko incident, or that Mr. Loftus asked Mr. Petch a leading question.  Consequently, the introduction of this evidence does not warrant a new trial.  See Finch, 941 F. Supp. at 1416.

### 4. Improper Argument to the Jury

Finally, the Department argues for a new trial on the basis that the verdict was the result of passion and prejudice.  The jury awarded damages of $1,000,000, which was reduced to

43

$300,000.  See 42 U.S.C. § 1981a(b)(3)(D).  The Department argues that, because the only

evidence Ms. Hall presented on the issue of damages were feelings of "embarrassment" and

being "upset," something else must have caused the jury to award $1,000,000.[13]  (See

Defendant's Brief in Support of its Post-Trial Motions. Dkt. Entry 108, at 29-30.)  That

"something else," claims the Department, was (1) Mr. Loftus' statement during closing

argument that the jury should light a "bonfire" under the Department, (TR-4, at 20), and (2) Mr.

Loftus' alleged misrepresentations of the record during his closing argument.[14]  (See

Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 30-33.)  Ms. Hall

counters that the Department failed to object to the allegedly improper arguments and,

therefore, this ground is waived.  (See Plaintiff's Brief in Opposition to the Defendant's Post-

---

[13]The fact that the jury awarded a substantial sum of compensatory damages does not, on its own, establish that the award was the product of "passion and prejudice."  Evans v. Port Authority of New York and New Jersey, 273 F.3d 346, 352 (3d Cir. 2001).  However, a compensatory damages award must be supported by the evidentiary record, and the Court has an obligation to ensure "the jury did not 'abandon analysis for sympathy.'"  Id. (quoting Gumbs v. Pueblo International, Inc., 823 F.2d 768, 773 (3d Cir. 1987)).  Here, the jury heard about the embarrassment and humiliation Ms. Hall endured, the deterioration of her working relationship with others, and the frequent disciplinary confrontations.  See Part II-A-2-a), supra. Additionally, the jury observed Ms. Hall's demeanor and could infer that, despite her strong personality and devotion to her job, the experience at SCI-Mahanoy had led to frustration over a seemingly never-ending cycle of conflict and hostility.

[14]It is proper to note that the jury's passion may have been inflamed by *defense counsel's* closing argument, which consisted largely of an attack on Ms. Hall's character and an appeal to the jury that she deserved to be treated poorly.  (See, e.g., TR-4, at 27-28.)  A jury, concluding that a plaintiff had been the *victim* of an abusive working environment, may indeed have a harsh reaction to the kind of attack on the victim that defense counsel pursued in his closing argument.

Trial Motions, Dkt. Entry 111, at 9)

As previously stated, it is well-settled within the Third Circuit that a party's objection at trial is a prerequisite to complain post-trial. Lyles v. Flagship Resort Development Corp., 371 F. Supp. 2d 597, 603 (D.N.J. 2005) (citng Waldorf, 142 F.3d at 629; Murray v. Fairbanks Morse, 610 F.2d 149, 152 (3d Cir. 1979); Boehringer Ingelheim Vetmedica, Inc. v. Schering Polough Corp., 166 F. Supp. 2d 19, 40 (D.N.J. 2001)).  An attorney's allegedly improper statements during closing argument are not immune from this principle.  In Waldorf, the plaintiff, who was left a quadriplegic following an accident that was the subject matter of the litigation, challenged the defense attorney's remarks during closing argument.  142 F.3d at 628-29.  The attorney referred to another witness, also a quadriplegic, and his remarkable perseverance following his catastrophic injuries to earn bachelor's and master's degrees.  Id. at 629.  The attorney referenced these facts in the context of the plaintiff's failure to pursue any employment or education subsequent to his accident.  Id.  However, the plaintiff did not object during the trial. Id.  As such, the district court declined to consider this ground for the first time in a post-trial motion, and our Court of Appeals affirmed, reasoning that a party waives the right to complain post-trial on matters which a party failed to interpose an objection during the trial.  Id.; see also Murray, 610 F.2d at 152 (refusing to consider whether counsel's reference during closing argument to a specific sum of damages was improper where no objection was found in the record).

In the case at bar, the Department did not interpose an objection during Mr. Loftus'

closing.  At oral argument, the Department's counsel conceded that he did not object at the

time of the closing; that he did not ask for a sidebar conference to avoid having to object in the

presence of the jury; and that he did not approach the bench after Mr. Loftus' closing argument

and request a mistrial.  (See Transcript of Oral Argument, Sept. 15, 2005, Dkt. Entry 129, at

41.)  Like the testimony regarding Lieutenant Wetzel, the first time the Department objected to

Mr. Loftus' closing argument was in its motion for a new trial.[15]  Therefore, the Department will

not be heard to complain on this ground as a basis for post-trial relief.[16]

_____

[15]In Fineman v. Armstrong World Industries, Inc., 980 F.2d 171, 207 n.26 (3d Cir. 1992),
our Court of Appeals found no error in the district court's conclusion that the party "was not
required to object to each and every objectionable remark because requiring such action would
have unnecessarily created even more prejudice to [the party] in the eyes of the jury."  In
Fineman, the party moved in limine to limit the attorney's closing argument, placed several
objections on the record during the closing argument, and moved for a mistrial following the
closing argument.  Id.  Here, the Department took none of these steps, nor any other action, to
preserve its objection.

[16]Even if the Department did not waive this ground, Mr. Loftus' closing argument was not
so prejudicial as to warrant a new trial.  "A new trial may be granted only where the improper
statements 'made it reasonably probable that the verdict was influenced by prejudicial
statements.'"  Greenleaf v. Gerlock, Inc., 174 F.3d 352, 363-64 (3d Cir. 1999) (quoting
Fineman, 980 F.2d at 207).  However, a combination of improper remarks is necessary to
establish prejudicial impact, such as:

"(1) [the attorney] attempt[s] to prejudice the jurors through repeated
inappropriate references to the defendants' wealth; (2) [the attorney] assert[s]
his personal opinion of the justness of his client's cause; (3) [the attorney]
prejudicially refer[s] to facts not in evidence; and (4) without provocation or
basis in fact, [the attorney makes] several prejudicial, vituperative[,] and
insulting references to opposing counsel."

**C. Remittitur**

The Department argues that the Court should require remittitur of the damage award.

The jury awarded Ms. Hall $1,000,000 in compensatory damages on her retaliation and hostile

work environment claims.  This award was reduced by the Court to $300,000 pursuant to

statutory limitations.  The Department argues the award was not rationally based upon the

evidence and that Ms. Hall's testimony concerning her emotional distress was "insubstantial."

(Defendant's Brief in Support of its Post-Trial Motions, Dkt. Entry 108, at 33.)

The use of remittitur is committed to the sound discretion of the district court judge.

Evans v. Port Authority of New York and New Jersey, 273 F.3d 346, 354 (3d Cir. 2001).  In

determining an appropriate award, the prudent course is to evaluate the record in light of

damage awards for pain and suffering and emotional distress rendered in other cases.  See,

---

Fineman, 980 F.2d at 207-08 (quoting Draper v. Airco, Inc., 580 F.2d 91, 95 (3d Cir. 1978)).

At the outset, Mr. Loftus' statement of lighting a "bonfire" is not per se prejudicial,
entitling the Department to a new trial.  See Greenleaf, 174 F.3d at 364 n.9 (attorney's
statement to the jury that a verdict in favor of the plaintiff would "send a message" to the
defendant does not justify a new trial).  Furthermore, Mr. Loftus did not refer to the
Department's wealth or ability to pay damages; did not personally opine as to the justness of
Ms. Hall's cause; and he did not launch "vituperative and insulting" statements at Mr. Doyle.
And, although Mr. Loftus' statement that Major Erickson testified "we can't keep track of
everybody" was erroneous – a fact acknowledged by Mr. Loftus, (see Transcript of Oral
Argument, Sept. 15, 2005, Dkt. Entry 129, at 42-43) – the other alleged misrepresentations are
reasonable inferences drawn from the testimony.  Accordingly, even if the Department had not
waived this ground, the verdict was not influenced by improper statements.

e.g., Delli Santi v. CNA Insurance Cos., 88 F.3d 192, 206 (3d Cir. 1996).  The means

employed should enable the Court to attain its objective of setting damages at the "'maximum

recovery that does not shock the judicial conscience.'" Evans, 273 F.3d at 355 (quoting Gumbs

v. Pueblo International, Inc., 823 F.2d 768, 774 (3d. Cir. 1987)).

     In Evans, the jury rendered a verdict in favor of the plaintiff on a race discrimination

claim and awarded compensatory damages of $1.15 million.  Id. at 350.  The district court

concluded that the jury award did not result from passion or prejudice, but nevertheless held

that remittitur of $740,000 was warranted.  Id. at 353.  In reaching this conclusion, the district

court observed that plaintiff endured the discrimination for many years, and was forced to

observe her colleagues with less experience get promoted through routes to which plaintiff was

denied access.  Id. at 355.  The court noted the plaintiff began to doubt herself and questioned

whether the ordeal was worth it.  Id.  She referred to herself as a "grouch," and the

discrimination had taken a toll on her relationship with her husband and children.  Id. at 352 n.5

& 355.  Plaintiff was designated to train individuals for positions that plaintiff herself was more

qualified to take.  Id. at 355.  Although plaintiff had a strong personality, the court concluded

that the jury could have understood the environment and atmosphere that fostered the racial

discrimination that plaintiff endured for many years.  Id.  The supervisors called her lawsuit a

"joke," and throughout the proceedings exhibited arrogance.  Id.  The $375,000 damage award,

after the remittitur, was a substantial amount, but the Court of Appeals emphasized that the

plaintiff's emotional trauma could not be ignored.  Id. at 355-56.

        In Valentin v. Grozer-Chester Medical Center, 986 F. Supp. 292, 296-97 (E.D. Pa. 1997), the plaintiff brought an action under Title VII for unlawful national origin discrimination and retaliation, the relevant events occurring over a period of approximately two years. Following a trial, the jury rendered a verdict in plaintiff's favor and awarded her damages of, inter alia, $209,000 for pain and suffering.  Id. at 297.  The district court ordered remittitur of three-fourths of the pain and suffering damages, thereby reducing the award to $52,250.  Id. at 305.  The court recognized that evidence on plaintiff's emotional distress was limited to her testimony.  Id. at 304-05.  The plaintiff testified that she was depressed and upset because of her termination, and it was humiliating to have to explain the circumstances of her termination to prospective employers.  Id. at 305.  However, the plaintiff was functioning well enough to obtain subsequent employment in a matter of a few months.  Id.  Where the only evidence on emotional distress is the plaintiff's testimony, and there is no "evidence of physical damage or the need for professional care, there must be a 'reasonably probability, rather than a mere possibility, that damages due to emotional distress were in fact incurred.'"  Id. (quoting Spence v. Board of Education of Christiana School District, 806 F.2d 1198, 1201 (3d Cir. 1986)).  While the plaintiff's testimony sufficed to justify pain and suffering damages, $209,000 was "grossly excessive," particularly where the court granted judgment as a matter of law to the defendants on the national origin discrimination claim and part of the retaliation claim.  Id. at 302 & 304.

Therefore, the court awarded the plaintiff one-quarter of the jury award of pain and suffering damages, or $52,250.  Id. at 305.

In Shesko v. City of Coatesville, 324 F. Supp. 2d 643, 647 (E.D. Pa. 2004), the plaintiff sued her employer for unlawful sex discrimination, alleging she was denied a promotion because of her gender. The jury returned a verdict in plaintiff's favor, id. at 648, and awarded compensatory damages of $20,000, id. at 652. The court denied the defendant's request for remittitur.  The court acknowledged that the necessity of a "reasonable probability" that damages were incurred for emotional distress where plaintiff's testimony is the only evidence on that issue.  Id.  However, the court ruled that plaintiff's testimony that she was sad and depressed, had difficulty observing others in the position which she was denied, and that being denied a promotion generally made it difficult to perform her duties on a regular basis was sufficient to conclude the jury's award was rationally based.  Id.

After a review of the record, the Court concludes that a remittitur of $225,000, or three-fourths, is appropriate in light of the evidence and foregoing case law.  Ms. Hall's receipt of $75,000 is adequate to compensate her for the damages incurred.  Ms. Hall sufficiently established the existence of a hostile work environment, which she endured for an extended period of time, and Ms. Hall presented evidence of her injury.  Certainly, Ms. Hall's emotional damages are more extensive than the harm sustained by the plaintiffs in Shesko and Valentin. The embarrassment, humiliation, and mental anguish from the Christmas greeting; the

certificate of recognition; the pat-down by a male corrections officer in the presence of an

amused supervisor; the decision to modify a particular position after Ms. Hall expressed interest

and applied for the position; the scrupulous oversight and harsh discipline by her supervisors;

and the deterioration of her working relationship with fellow officers and supervisors is more

severe than the minimal damage inflicted in Shesko and Valentin, particularly where those two

cases ultimately allowed recovery for single discrete acts.  Cf. Shesko, 324 F. Supp. 2d at 652

(failure to promote claim; plaintiff testified to being "sad" and "depressed" and found it difficult to

work after being passed over for the promotion); Valentin, 986 F. Supp. at 305 (judgment as a

matter of law granted to defendant on all claims except for retaliatory termination; plaintiff

testified she was depressed and upset by the termination, and found it humiliating to explain the

circumstances surrounding the termination to prospective employers).  And, although Ms. Hall's

testimony was the sole evidence on the issue of damages, she has adequately demonstrated a

"reasonably probability" that emotional distress and pain and suffering damages were actually

incurred.

On the other hand, a recovery in excess of $75,000 is not sustainable based upon the

record.  Although Ms. Hall testified to the effect the conditions at SCI-Mahanoy had on her

personally, as well as the interaction with her co-workers and supervisors, she did not present

any evidence that the hostile work environment affected her life outside of SCI-Mahanoy.  For

instance, neither Ms. Hall nor any other witness testified to how her relationship with family

members has been impacted.  Cf. Evans, 273 F.3d at 352 n.5 (plaintiff testified that the

defendant's actions caused her to be "moody" and "irritable," which affected her relationship

with her husband and children).  Ms. Hall presented no competent evidence that the

Department's conduct necessitated psychological counseling or otherwise required

hospitalization or medical treatment.  To be sure, such evidence is not essential to the issue of

liability for a hostile work environment claim; however, such evidence surely is relevant to the

damages that can be recovered.  Additionally, Ms. Hall had not taken any leave of absence

from work because of the hostile work environment, which also militates against an award

exceeding $75,000.  See Hurley v. Atlantic City Police Department, 933 F. Supp. 396, 423-25

(D.N.J. 1996) (in reducing compensatory damages from $575,000 to $175,000, the district

court considered, inter alia, that "[plaintiff] was compelled to leave work on stress leave for a

year").  Furthermore, her employment performance evaluations remained satisfactory

throughout her tenure.

       The decision to reduce Ms. Hall's award to $75,000 is buttressed by the decision

granting the Department's motion for judgment as a matter of law with respect to the retaliation

claim.  The existence of that claim may have influenced the jury's compensatory damage

award, and the Court cannot ignore this when determining an appropriate order of remittitur.

See Valentin, 986 F. Supp. at 305 (in reducing compensatory damage award, the court noted

that "[j]udgment as a matter of law has been granted on claims that may have improperly

influenced the damage award").

Accordingly, although an award of compensatory damages for pain and suffering and emotional distress is warranted, $300,000 is "clearly excessive."  Therefore, the Department's motion for remittitur will be granted, and Ms. Hall will be required to remit $225,000.  In the event Ms. Hall declines to accept an award of $75,000, the Court alternatively grants a new trial limited to the issue of damages for the hostile work environment claim.

## III. <u>CONCLUSION</u>

The Department's motion for judgment as a matter of law will be granted as to Ms. Hall's retaliation claim, but denied with respect to the hostile work environment claim.  The Department's motion for a new trial will be denied.  Finally, the Department's motion for remittitur will be granted.  Should Ms. Hall decline to accept $75,000 as compensatory damages, the Court grants a new trial limited to the issue of damages on Ms. Hall's hostile work environment claim.  An appropriate Order follows.

<u>s/ Thomas I. Vanaskie</u>
Thomas I. Vanaskie
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DEBRA HALL** | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:CV-02-1255** |
| | : | **(JUDGE VANASKIE)** |
| **COMMONWEALTH OF PENNSYLVANIA** | : | |
| **DEPARTMENT OF CORRECTIONS** | : | |
| **Defendant** | : | |

<u>**ORDER**</u>

   **NOW, THIS 25th DAY OF SEPTEMBER, 2006,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

   1. Defendant's Motion for Judgment as a Matter of Law (Dkt. Entry 93) is **GRANTED** as to the retaliation claim and judgment thereon is to be entered in favor of Defendant

   2. Defendant's Motion for Judgment as a Matter of Law (Dkt. Entry 93) as to the hostile work environment claim is **DENIED**.

   3. Defendant's Motion for a New Trial (Dkt. Entry 93) is **DENIED**.

   4. Defendant's Motion for a Remittitur (Dkt. Entry 93) is **GRANTED** as follows:

      a) The Plaintiff shall **REMIT** $225,000 of the compensatory damage award; and

      b) Should the Plaintiff refuse to accept $75,000 in compensatory damages, a new trial on the issue of damages on  the hostile work environment claim shall be conducted.

   5. Plaintiff shall inform the Court and opposing counsel in writing no later than October 5, 2006 as to whether the remittitur is accepted.  In the event the remittitur is not accepted, a telephonic conference shall be conducted on **October 12, 2006, at 10:30 a.m.**  Counsel for

Plaintiff shall be responsible for making the arrangements for the conference call.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge